MR. JUSTICE WEBER,
dissenting:
While I substantially agree with the principles of law contained in the majority opinion, I dissent from the application of the principles to the facts of the present case. Rate cases are extremely difficult for *125 our appellate review because of the complexity of the information presented, the extensive testimony, and also because the Public Service Commission (PSC) sets forth hundreds of findings of fact and many conclusions, making it difficult to analyze or distinguish. In the present case (MDU II), I contend that there is a superficial adherence to the opinions of this Court, but in actuality a fundamental disregard of the past holdings. Let us consider the two most recent cases involving similar issues.
Montana-Dakota Utilities Co. v. Bollinger (Mont. 1981), [_ Mont. _,] 632 P.2d 1086, 38 St.Rep. 1221, (MDU I) was decided in 1981. In MDU I we vacated the judgment of the district court and remanded the case to the PSC for additional hearings. MDU I involved the same utility company, the same Knife River Coal Company, and the same question of rate fixing with regard to coal sold by Knife River, MDU’s wholly owned subsidiary. We there chose not to accept the rate of return theory as presented by the Consumer Counsel through the expert Dr. Wilson. We stated as follows:
“In view of the necessity for a rehearing, the PSC should again consider if there is an independent, competitive market which establishes a going market price for coal, from which the PSC can determine if the price MDU pays Knife River for coal is reasonable. While it is true that the PSC found that absolute comparability between coal prices impossible to determine, it appears to this Court that the prices paid by a number of other companies to Knife River for two-thirds of its coal production is evidence of a competitive market for comparison to the Knife River price paid by MDU. In addition, there was evidence of prices charged by other companies in the competitive area. If the PSC finds that the present evidence is insufficient, it appears appropriate that the PSC require the parties to submit additional evidence . . .
“As a matter of justice, it appears to this Court that it might be better for the PSC to use a marketplace cost of coal approach, if it can obtain sufficient facts for its determination, rather than using the rate of return method with all of its difficult theories and computations. While the PSC does have the right to choose the method followed, this Court did not find a factual reason for the summary rejection of the marketplace cost of coal approach. (Emphasis supplied.]”
MDU I, 632 P.2d at 1091-92. We therefore reversed the PSC determination because there was no factual reason given for the summary rejection of the marketplace cost evidence submitted by MDU.
*126 With MDU I in mind, let us consider the next case, Montana Power Co. v. Department of Pub. Serv. (1983), 204 Mont. 224, 665 P.2d 1121, herein referred to as MPC. The argument between the parties in MPC was similar to that in MDU I. The MPC presented extensive evidence by Arthur D. Little, Inc., a firm of national prominence in the field of coal supply contracts. That firm sought and received bids from nine companies and determined that the price of coal charged by the MPC subsidiary was the lowest price available to MPC’s Billings plant. In referring to MDU I, this Court concluded that we did not hold that the PSC must use a market price method if a competitive marketplace can be established, but that the choice of methods was left to the PSC. As a result the Court did not consider whether there was substantial evidence to support the market price method. Instead, it analyzed whether there was substantial evidence to support the rate of return method. The standard which it applied was whether the PSC acted arbitrarily and unreasonably without sufficient evidence to support its findings. The Court then pointed out that the MPC did not challenge or oppose the values submitted by the Consumer Counsel through Dr. Wilson, its expert. As a result it then concluded that the record was sufficient to support the decision made by the PSC and no challenge would be allowed on appeal. A vigorous dissent was prepared by Justice Harrison pointing out that there was an arbitrary and capricious decision made by the PSC. I wish to emphasize that in MPC, the rule applied was that no argument could be made by MPC, because it had failed to present evidence at the administrative level opposing the expert evidence submitted by the Consumer Counsel.
The present case is a continuation of the conflict between marketplace cost of coal approach as compared to rate of return approach. Here it is important to consider the nature of the evidence submitted by both MDU and the Montana Consumer Counsel. The uncontradicted evidence submitted by MDU established that there were not less than six major generating stations in the general area and that there were five different coal mines supplying coal to the stations. As a result those purchasing coal from Knife River had a number of other alternatives. Other witnesses testified that there is a very competitive market for the supplying of Northern Plains lignite coal in this area. In addition to Knife River there are four companies, each of which operate mines that have the capacity to produce in excess of one million tons per year of Northern Plains lignite, the same type of coal produced by Knife River. These were *127 Consolidation Coal Company, now wholly owned by Dupont, North American Coal Company and its subsidiary, Falkirk Mining Company, and Baukol-Noonan, Inc. In addition North American was in the process of developing a new mine through another subsidiary. There were also several other operators producing smaller quantities basically for domestic markets. The total output of lignite coal from this area in one year was close to eighteen million tons. Detailed evidence was presented of the coal prices charged by these various operators. In addition, evidence was presented on the approximately seventy-five percent of Knife River’s coal which was sold on the marketplace to parties other than MDU. In substance, MDU presented more than sufficient evidence to prove the competitive market price for coal in the Knife River vicinity. In my view, the evidence was clearly sufficient to meet the standard outlined in MDU I.
In addition, I would emphasize that no contrary evidence was submitted by any party. At that point, if the rationale of MPC were applied, it would seem that the PSC could have been required to consider in detail and explain in detail its reasons for refusing to accept the uncontradicted evidence, and to determine the coal price on a market price theory. That seems particularly true in view of our holding in MDU I where we suggested as a matter of justice that it appeared that it might be better to use the marketplace cost of coal approach. MDU I, 632 P.2d at 1092. However, I recognize that that statement was weakened by MPC when we stated that the choice of methods was left to the PSC.
However, I suggest that while the choice of methods may be left to the PSC, it should not be allowed to make an arbitrary decision denying the use of the marketplace cost of coal. Instead of pointing out any shortcomings in the evidence submitted by MDU, the PSC quoted from a Department of Justice report, “Competition in the Coal Industry,” which stated that in practice, identification of the appropriate competitive prices is virtually impossible. That quote emphasizes that coal prices are not some broad national aggregate but are tied to very specific locations and quality factors. It further emphasizes that it may prove difficult to estimate an appropriate set of market prices to use. That is not a justification for refusing to consider the evidence submitted by MDU. That is a general statement which pertains to the comparison of coal prices on a broad or national scale. It does not appear determinative when we have specific price figures offered for the sale of coal of the same type and *128 quality in the specific area, with the only differing factor being transportation costs. I conclude that as was true in MDU I, the Court cannot find a factual reason for the summary rejection of the marketplace cost approach and the judgment should therefore be vacated.
As a result of my foregoing analysis, I disagree strongly with the conclusions in the majority opinion that MDU presented no evi-. dence which tracked its own coal expense by market price and that MDU did not present evidence of fair market prices from comparable coal companies. In the present case, the evidence presented by MDU of the seventy-five percent of the coal sold by Knife River to other parties is substantial evidence of such coal expense as only twenty-five percent was sold to MDU itself. As pointed out in MDU I, it should appear to this Court that the prices paid by a number of other companies to Knife River for two-thirds (which has now become seventy-five percent) of its coal production is evidence of a competitive market for comparison of the Knife River price to MDU. I also disagree with the conclusion that MDU failed to present evidence of fair market prices from comparable coal companies as there is substantial evidence of that type which is unrebutted in the record.
I further disagree with the conclusion that there is substantial evidence to support the rate of return method as determined by the PSC. In contrast to MPC where the utility failed to present any rebutting testimony to that testimony of Dr. Wilson, in the present case, MDU presented substantial' evidence to show that there were a number of problems with the testimony of Dr. Wilson. The PSC pointed out in its own findings that the inclusion of eastern mining operations which mine bituminous coal and have characteristics significantly different from Knife River operations posed significant problems in determining if they are comparable coal companies. As a result the PSC concluded that it was reasonable to check such admittedly imperfect data by looking at other areas of the economy for profitability figures. The response of the PSC to the proof of the inadequacy of the Dr. Wilson evidence was to use as comparable companies, other companies which no one contended were comparable. These included Ashland Oil, Atlantic Richfield, Houston Natural Gas, Mobil, Kerr-McGee, and Occidental Petroleum, most of which were oil companies. The use of such companies which no one contended were comparable in itself appears to be arbitrary. Further, the excess profit calculation performed by Dr. Wilson considers *129 the profitability of the entire Knife River Coal Company. The most profitable sales by that company were not the sales to MDU. As a result, there was an improper scaling back of the earnings of Knife River. As contended by MDU, the effect of this methodology is to capture a portion of the Knife River profits from sales to parties other than MDU and use them to subsidize the MDU electric customers.
The effect of the calculation of the rate of return method by the PSC is the indirect regulation of Knife River. Apparently that is the theory which the PSC set forth in Finding 165 which is quoted in the majority opinion.
In MDU I, the majority opinion discussed the California approach of rate determination (which Justice Sheehy earnestly advocated in his dissent) and in refusing to apply that approach stated as follows:
“Perhaps the, PSC, in setting the rate of return level, was relying upon the theory prevalent in the ‘California approach’ to the issue at hand. Under this approach, the subsidiary is treated not as an independent entity but as part of the utility for ratemaking purposes. The theory underlying this position was discussed in Washington Water Power v. Idaho Public Util. (1980) . . .
“We note, however, that the majority of those cases using this approach involve the Bell Telephone System and its manufacturing subsidiaries. These subsidiaries sell virtually all their manufactured products to the parent, Bell Telephone — a fact which is materially different from the present situation where the bulk of Knife River coal (a depletable natural resource) is sold to customers other than its parent .... Such an approach should not be deemed applicable in this instance.” (Emphasis supplied.)
MDU I, 632 P.2d at 1090-91. I frankly am not clear of the effect of the majority opinion on the “California approach.” From the statements made by the PSC, it seems clear that it intends to pursue such an approach in its rate determination. If the intention of the majority opinion is to overrule this determination in MDU I, because of its extreme significance on all similar cases, it should be discussed in detail and the rationale explained. I personally do not find any argument presented which persuades me that the “California approach” is a necessary part of the rate determination process for Montana. There of course has been no such determination by the legislature.
Under the factual analysis as above set forth, I conclude that it is not appropriate to affirm the PSC and the order of the District *130 Court which in turn affirmed the PSC. I would remand this case for further proceedings.